IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**ROBERT J. WHEELER,**                          Case No. 3:14 CV 2689

      Plaintiff,

      v.                                       Magistrate Judge James R. Knepp, II

**CSX TRANSPORTATION, INC.**

      Defendant.                              MEMORANDUM OPINION AND ORDER

### INTRODUCTION

This is a case involving a claim under the Federal Employers' Liability Act, 45 U.S.C. §

51 ("FELA"). While working for Defendant CSX Transportation, Inc., ("Defendant"), Plaintiff

Robert J. Wheeler ("Plaintiff") contends he was injured when moving a case of water bottles stored

on the locomotive engine on which he was working. Plaintiff filed the instant action alleging

violations of the FELA and *per se* negligence based on violation of the Federal Locomotive

Inspection Act ("LIA"), 49 U.S.C § 20701 *et seq.* Pending before the Court is Defendant's Motion

for Summary Judgment. (Doc. 26). Plaintiff has opposed (Doc. 30), and Defendant has replied

(Doc. 31). Jurisdiction is proper under 28 U.S.C. § 1331. The parties have consented to the

undersigned's exercise of jurisdiction. (Doc. 20). The Court held oral argument on the motion on

July 13, 2017. (Non-document entry dated July 13, 2017). For the reasons discussed below,

Defendant's motion is granted in part and denied in part.

### BACKGROUND

On November 9, 2011, Plaintiff was working as a conductor for Defendant on a train from

Bedford Park, Illinois (Chicago), to Willard, Ohio. (Plaintiff's deposition, Doc. 30-1, at 8). The

engineer on the train was Chuck Shreve. *Id.* As the train approached the Willard yard limits,

Plaintiff began to prepare to leave the engine. *Id.* at 9. He had stored his grip and backpack behind the conductor's seat, and as the train approached the terminal, he moved them into the nose of the engine. *Id.* at 9-11.

Plaintiff then wanted to replenish the refrigerator in the cab of the locomotive with bottled water. *Id.* at 10-11. It was "common courtesy" to replenish the refrigerator with water for the outbound crew. (Shreve deposition, Doc. 30-3, at 5). Locomotive crews obtain the water bottles at various yard offices. *See* Doc. 30-1, at 11; Berghaus deposition, Doc. 30-2, at 3-4. There is no specific designated location for a locomotive crew to store water bottles, but crews are instructed to place them somewhere out of the way. (Doc. 30-3, at 4) ("Out of the way so it's not, you don't trip on it, you don't fall on it."); (Doc. 30-2, at 4) ("There's no set location of where we train [employees] to actually place [water]. We just tell them not to create a tripping hazard with them.").

The cab of the locomotive contained three seats – an engineer's seat, a conductor's seat, and a center seat. (Doc. 30-1, at 8). A box containing bottles of water had been placed behind the center seat in the cab before Plaintiff and Shreve boarded. *Id.* at 11. Plaintiff testified the box of water was "wedged" behind the seat. (Doc. 30-1, at 17) ("It was on an angle. That's all I can tell you. It was on an angle wedged in there.").[1]

In attempting to move the box, Plaintiff first tried to get it from the engineer's side. (Doc. 30-1, at 11). He bent down on one knee and placed his right hand on the center seat, while attempting to slide the box out from behind the seat with his left hand. *Id.* Because the box was

---

1. A color photograph depicting the water behind the seat is included in Defendant's Reply. *See* Doc. 31, at 10. (The photograph is an exhibit to the Berghaus deposition. *See* Doc. 30-2, at 33).It is not clear, however, whether the photo depicts the precise condition or position of the box of water at the time of the incident.

"wedged in", Plaintiff "got up and went around to the other side[.]" *Id.* When he could not retrieve the box, Plaintiff then stood up, walked around to the right side of the center seat (the conductor's side), bent over the center seat and attempted to reach the box with his right hand. *Id.* He bent across the seat, and grabbed the box, but "had a hard time trying to get the box out of there" and "tore the box" in the process. *Id.* As he bent over, he "twisted and wrenched" his back. *Id.* Plaintiff ended up laying across the seat. *Id.* at 12; Doc. 30-3, at 3 ("[W]hat I remember he was stretched over the seat and the water was behind the seat he was stretched over.").[2] Shreve did not see Plaintiff attempt to reach the water, but heard him "ma[k]e an exclamation and sa[y] he had thrown something out in his back." (Doc. 30-3, at 3). Shreve helped Plaintiff, who was visibly in pain, off the train and into the crew room. *Id.* An ambulance was called and Shreve helped Plaintiff into the ambulance. *Id.*

After the incident, road foreman of engines Michael Berghaus assisted in conducting an investigation. *See* Doc. 30-2.

In his Complaint, Plaintiff alleges, *inter alia*, that Defendant violated the FELA in a several ways:

a) In failing to provide the Plaintiff with a reasonably safe place to work;

b) In failing to use reasonably safe methods in its train operations;

c) In failing to exercise ordinary care to furnish a locomotive engine in a reasonably safe condition[];

d) In storing cases of water bottles in a location on said engine which was difficult to access and placed stress and strain on Plaintiff's back as he attempted to lift said cases;

---

2. Michael Berghaus, who helped to conduct Defendant's investigation into the incident, also made a computer drawing of what he believed had happened and Plaintiff's positioning. *See* Doc. 30-2, at 48.

e)  In storing cases of water bottles in a location on said engine which increased Plaintiff's risk of injury;

f)  In failing to provide Plaintiff and his crew a storage area on said engine where cases of water bottles could be stored in a reasonably safe manner;

g)  In failing to adequately inspect and maintain its engines;

h)  In failing to warn Plaintiff of unsafe conditions;

i)  In allowing unsafe practices to become common practices;

j)  In failing to comply with [the LIA];

k)  In failing to comply with the applicable provisions of Part 229-Locomotive Safety Standard of the Code of Federal Regulations including: [49] C.F.R. §229.45 and 49 C.F.R. §229.119.

(Doc. 1, at 3).

In his deposition, Plaintiff described what he thought Defendant did wrong:

Q      Getting back to your incident here. What is it you think CSX did wrong?

A      They didn't provide a safe place for the box of water.

Q      And - -

A      They could have had a shelf or something above the cooler or built something special. They got holders for the hammer and the wrenches and the air hoses, but no shelf or holder for the water.

Q      Are there locomotive you're aware of that have shelves or holders for the water?

A      No, not that I'm aware of. They did have - - one did have a microwave. That's the first time I ever experienced that.

Q      But this isn't a case where there is normally a shelf and it's missing?

A      No.

Q      It's not a standard piece of equipment?

A      No.

4

Q        You've never seen a holder or shelf for water?

A        Not that I know of.

Q        What was unsafe about your working area?

A        That box of water was improperly stored.

Q        Where are they normally stored?

A        I've seen locomotives with 10 cases, loose bottles all over, anywhere in
         between, some of them with no water. I've made many suggestions and
         complained many times that there's no place to store this stuff.

Q        Water in particular?

A        Water in particular.

***

Q        You never filled out a PI-82 or an unsafe equipment report or anything like
         that?

A        No. As far as water goes, no. Usually if you have unsafe equipment, you
         tell the yardmaster or trainmaster to send somebody out to fix it. There was
         no shelf to fix. There was nothing to fix.

(Doc. 30-1, at 16-17).

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no

genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of

law." When considering a motion for summary judgment, the Court must draw all inferences from

the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or

determine the truth of any matter in dispute; rather, the Court determines only whether the case

contains sufficient evidence from which a jury could reasonably find for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden

5

of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

### DISCUSSION

Defendant has moved for summary judgment, making three interrelated arguments: 1) Plaintiff has no viable claim under the LIA; 2) the LIA precludes a FELA claim that the locomotive should have been equipped with a shelf or holder for water bottles; and 3) Plaintiff cannot show negligence. (Doc. 26). Plaintiff responds that there are disputed issues of material fact and the LIA does not preclude a FELA claim. (Doc. 30).

### **LIA Claim**

Defendant first argues Plaintiff has not presented evidence of an LIA claim. (Doc. 26, at 3-4). Plaintiff responds that there are disputed issues of fact preventing summary judgment on his LIA claims. (Doc. 30, at 11-12). For the reasons discussed below, the undersigned agrees with Defendant.

A defendant injured due to a violation of the LIA may bring an action under the FELA. *Lilly v. Grand Trunk Western R. Co.*, 317 U.S. 481, 485 (1943).[3] The LIA provides:

> A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—
>
> (1) are in proper condition and safe to operate without unnecessary danger of personal injury;
>
> (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
>
> (3) can withstand every test prescribed by the Secretary under this chapter.

---

3. *Lilly* addressed the Boiler Inspection Act, 45 US.C. § 23, which was the precursor to the current LIA.

49 U.S.C. § 20701. A violation of the LIA results in strict liability. *Lilly*, 317 U.S. at 485; *Mickler v. Nimishillen & Tuscarawas Ry. Co.*, 13 F.3d 184, 188 (6th Cir. 1993) (citing *Urie v. Thompson*, 337 U.S. 163, 188-89 (1949)); *see also Szekeres v. CSX Transp., Inc.*, 617 F.3d 424, 427 (6th Cir. 2010) ("A violation of the LIA is negligence *per se* under the FELA."). To show negligence per se, a plaintiff must show: 1) the locomotive was "in use"; 2) defendant violated a provision of the LIA; and 3) such violation caused plaintiff's injuries. *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432-33 (1958); *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 599 (6th Cir. 2013) ("A LIA violation constitutes negligence per se under FELA only if Plaintiff can establish that the violation was a cause of the injury.").

To establish an LIA violation, Plaintiff must show Defendant: "(1) failed to comply with regulations issued by the Federal Railroad Administration; or (2) violated the broad duty imposed 'on carriers to keep all parts and appurtenances of their locomotives in proper condition and safe to operate without unnecessary peril to life or limb.'" *Reed v. Norfolk S. Ry. Co.,* 312 F. Supp. 2d 924, 927 (N.D. Ohio 2004) (quoting *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088, 1091 (4th Cir. 1987)). "'Parts and appurtenances' does not encompass every device that conceivably *could* be installed" but rather only holds "carriers liable for *failure* to install equipment [if] the overlooked equipment (1) is required by applicable federal regulations or (2) constitutes an 'integral or essential part of a completed locomotive.'" *McGinn v. Burlington Northern R. Co.*, 102 F.3d 295, 299 (7th Cir. 1996) (emphasis in original); *see also Munns v. CSX Transp., Inc.*, 579 F. Supp. 2d. 924, 933 (N.D. Ohio 2008) ("Despite the LIA's liberal construction, railroads cannot be held liable under the LIA for failure to install equipment unless the equipment constitutes a part or appurtenance.") (internal citation and quotation omitted); *Reed*, 312 F. Supp. 2d at 927 ("Under [*Southern Ry. Co. v.*] *Lunsford*, 297 U.S. 398 (1936)], a carrier is not liable under the LIA for not

installing equipment unless the equipment is required by federal regulation, or is considered to be an integral or essential part of a locomotive.").

The Federal Railroad Administration ("FRA") has promulgated safety regulations for locomotives at 49 C.F.R §§ 200-265. Plaintiff points to two FRA regulations to support his LIA claim.[4] First, he points to 49 C.F.R. § 229.7(a)(1), which, mirroring the statutory language, provides that the LIA makes it unlawful to use a locomotive unless "the entire locomotive and its appurtenances . . . [a]re in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life or limb."

Second, Plaintiff cites 49 C.F.R. § 229.45, which provides:

> All systems and components on a locomotive shall be free of conditions that endanger the safety of the crew, locomotive or train. These conditions include: insecure attachment of components, including third rail shoes or beams, traction motors and motor gear cases, and fuel tanks; fuel, oil, water, steam, and other leaks and accumulations of oil on electrical equipment that create a personal injury hazard; improper functioning of components, including slack adjusters, pantograph operating cylinders, circuit breakers, contactors, relays, switches, and fuses; and cracks, breaks, excessive wear and other structural infirmities of components, including quill drives, axles, gears, pinions, pantograph shoes and horns, third rail beams, traction motor gear cases, and fuel tanks.

In support of his argument that the box of water behind the locomotive seat violates the LIA, Plaintiff cites *Reed*, *supra*, 312 F. Supp. 2d 924, and several other cases involving tripping

---

4. In his statement of facts, Plaintiff also references to the 1996 Federal Railroad Administration Locomotive Crashworthiness and Cab Working Conditions Report to Congress. (Doc. 30-4). That report contained a recommendation that "[a] permanent storage area for luggage and supplies (refrigerator, water cooler, locker for bottles, etc.) is needed." (Doc. 30-4, at 9). Plaintiff's expert, Paul Byrnes, also bases his opinion in part on these recommendations. (Doc. 30-5, at 2) (Defendant "failed . . . to comply with the recommendations of the FRA at page 9-11 as it pertains to the creation or designation of a permanent storage area for supplies, including water bottles."). These recommendations, however, are not the same as mandatory federal regulations and the undersigned therefore finds the citation thereto unpersuasive in relation to Plaintiff's LIA claim. Moreover, the reasoning given for those recommendations is inapplicable to the situation at hand. The recommendations noted that "[u]nsecured items present a potential tripping hazard during operation, and can turn into dangerous flying debris during a collision or emergency braking operations." *Id.* This is not the hazard Plaintiff complains of here.

8

or slipping hazards. First, four of these cases rely upon a finding that the defendants therein violated a *different* LIA regulation, 49 C.F.R. § 229.119(c), which provides: "Floors of cabs, passageways, and compartments shall be kept free from oil, water, waste or any obstruction that creates a slipping, tripping or fire hazard." *See Reed*, 312 F. Supp. 2d at 928-29 (rejecting defendant's argument that only integrated parts of the crew cab could constitute tripping hazards that violate § 229.119(c) and finding a box of bottled water placed in a walkway could violate that regulation); *Jarrett v. CSX Transp., Inc.*, 2008 WL 4239148, at *4 (N.D. Ohio) (finding an air hose left on locomotive cab floor constituted a tripping hazard in violation of § 229.119(c)); *Hawworth v. Burlington N. & Santa Fe Ry.*, 281 F. Supp. 2d 1207, 1213 (E.D. Wa. 2003) (granting summary judgment to an employee who tripped over a hose, finding such a tripping hazard violated § 229.119(c)); *Deso v. CSX Transp., Inc.*, 790 F. Supp. 2d 1, 8-9 (N.D.N.Y. 2011) (finding a question of fact existed as to whether a plastic bag on the floor of a locomotive violated § 229.119(c)'s prohibition on tripping hazards). There is no such claim of a tripping hazard or violation of § 229.119(c) in this case. Second, Plaintiff cites two cases regarding slipping hazards. *See Calabritto v. New York, N.H. & H.R. Co.*, 287 F.2d 394, 397 (2d Cir. 1961) (finding the presence of sand and oil on a locomotive floor could serve as the basis for an LIA violation); *Whelan v. Penn. Cent. Co.*, 503 F.2d 886 (2d Cir. 1974) (finding snow and ice on locomotive steps can serve as the basis for an LIA violation even in the absence of a specific regulation). Again, Plaintiff makes no such claim that the box of water constituted a slipping hazard in this case.

The undersigned agrees with Defendant that Plaintiff cannot maintain a claim under the LIA for failure to install special equipment or a shelf to house water bottles. *See McGinn*, 102 F.3d at 299; *Munns*, 579 F. Supp. 2d. at 933 (N.D. Ohio); *Reed*, 312 F. Supp. 2d at 927. The undersigned also agrees with Defendant that Plaintiff has not pointed to a "system or component" of the

locomotive with a "condition[] that endanger[ed] the safety of the crew" in violation of 49 C.F.R. § 229.45. Rather, Plaintiff points to a cardboard box of water. Similarly, Plaintiff has not presented evidence to show a genuine issue of material fact regarding a violation of 49 C.F.R. § 229.7, because he has not shown the "locomotive and its appurtenances" were not "in proper condition" and "safe to operate in the service to which they [were] put, without unnecessary peril to life or limb."[5] Therefore, Plaintiff has not provided evidence of a violation of either regulation, and his LIA claim based thereon must fail.

The undersigned therefore grants Defendant's motion for summary judgment on Plaintiff's LIA claim as Plaintiff has not shown Defendant: "(1) failed to comply with regulations issued by the Federal Railroad Administration; or (2) violated the broad duty imposed 'on carriers to keep all parts and appurtenances of their locomotives in proper condition and safe to operate without unnecessary peril to life or limb.'" *Reed*, 312 F. Supp. 2d at 927 (quoting *Mosco*, 1091).

### Preclusion of FELA Claim Regarding Installation of Shelf/Holder/Other Equipment

Defendant next argues the LIA precludes an FELA claim that the locomotive should have been equipped with a special shelf or holder for water bottles. (Doc. 26, at 4-6). Plaintiff responds that such a claim is not precluded, referencing the recent United States Supreme Court case of *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014). (Doc. 30, at 13-17).

---

5. This provision mirrors the LIA's general language. *Compare* 49 C.F.R. § 229.7 (providing that it is unlawful to use a locomotive "unless the entire locomotive and its appurtenances . . . [a]re in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life or limb"); *with* 49 U.S.C. § 20701 (providing that a locomotive may be used "only when the locomotive or tender and its parts and appurtenances . . . are in proper condition and safe to operate without unnecessary danger of personal injury").

This case requires an examination of the interplay between two federal statutes, both designed to promote railway safety.

The FELA provides:

> Every common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death *resulting in whole or in part* from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, ... or other equipment.

45 U.S.C. § 51 (emphasis added). An FELA claim requires Plaintiff to show: (1) he was injured in the scope of his employment; (2) his employment was in furtherance of Defendant's interstate business; (3) Defendant was negligent; and (4) that negligence played a part in causing his injury. Plaintiff must "prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 269 (6th Cir. 2007) (internal citations omitted). The statute incorporates a relaxed burden of proof on causation: if an employer's negligence played any part, however slight, in causing the injury, it is sufficient. *See CSX Transp., Inc. v. McBride*, 564 U.S. 685, 694 (2011).

The FELA has been "liberally construed . . . to further Congress' remedial goal of holding railroads responsible for the physical dangers to which their employees are exposed." *See Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994) (citing previous FELA cases relaxing the standard of causation required, expanded the doctrine of negligence per se beyond that covered by the common law rule, and permitted recovery for latent occupational diseases); *Akron, Canton & Youngstown R. Co.*, 342 U.S. 359, 362 (1952) (noting the general policy of FELA is "to give railroad employees a right to recover just compensation for injuries negligently inflicted by their employers"); *McBride*, 564 U.S. at 695. As the Supreme Court explained in *Gottshall:*

11

As we previously have recognized when considering § 51, when Congress enacted FELA in 1908, its "attention was focused primarily upon injuries and death resulting from accidents on interstate railroads." *Urie, supra,* 337 U.S., at 181, 69 S.Ct., at 1030. Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the " 'human overhead' " of doing business from employees to their employers. *Tiller v. Atlantic Coast Line R. Co.,* 318 U.S. 54, 58 . . . (1943). See also *Wilkerson v. McCarthy,* 336 U.S. 53, 68 . . . (1949) (Douglas, J., concurring) (FELA "was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations").

512 U.S. at 542.

Additionally, the LIA provides:

A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—

(1) are in proper condition and safe to operate without unnecessary danger of personal injury;

(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and

(3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701. The Supreme Court has noted the statute "is to be liberally construed in the light of its prime purpose, the protection of employees and others by requiring the use of safe equipment." *Lilly*, 317 U.S. at 486. The Boiler Inspection Act—the precursor to the LIA—is "substantially if not in form [an] amendment[] to" the FELA and "the congressional purpose underlying the [statute] is basically the same as that underlying" the FELA. *Urie v. Thompson*, 337 U.S. 163, 189-90 (1949) ("As with the [FELA], we do not doubt that the prime purpose of the [BIA] was the protection of railroad employees and perhaps also of passengers and the public at large . . . from injury due to industrial accident.") (internal citation omitted). The LIA does not provide a right of action, but it is well settled that an employee may bring such a claim under the FELA. *See Lilly*, 317 U.S. at 485.

12

The LIA does not contain an express preemption provision, but the Supreme Court has held the Congress intended to "occupy the field" of locomotive regulation. *Napier v. Atlantic Coast Line R.R.*, 272 U.S. 605, 613 (1926). The "power delegated to the [Interstate Commerce Commission] by the [BIA] as amended is a general one. It extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." *Id.* at 612. Thus, *Napier* held, state laws on these subjects are preempted by the BIA. *Id.* at 612-13. More recently the Supreme Court reaffirmed this proposition in *Kurns v. R.R. Friction Products Corp.*, 565 U.S. 625, 634 (2012), holding such preemption was broad, and encompassed defective design and failure to warn claims. This was so because "those claims '[were] directed at the same subject' as the LIA." *Id.* (quoting *Napier*, 272 U.S. at 612).

The parties correctly point out that the issue before the Court here is not one of preemption, however, but of preclusion. In a preemption case, the question is whether state law is preempted by federal law. *See Wyeth v. Levine*, 555 U.S. 555, 563 (2009). "This case, however, concerns the alleged preclusion of a cause of action under one federal statute by the provisions of another federal statute." *POM Wonderful*, 134 S. Ct. at 2236. Defendant contends Plaintiff's claim would be preempted by the LIA were it brought under state law, and applying the Sixth Circuit's decision in *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 429-30 (6th Cir. 2009), Plaintiff's FELA claim on the same basis is also precluded.

In *Nickels*, the Sixth Circuit joined the Fifth and Seventh Circuits in holding a claim brought under the FELA is precluded by the Federal Railway Safety Act ("FRSA") if such a claim would have been preempted if brought under state law. 560 F.3d at 430 (citing *Lane v. R.A. Sims. Jr., Inc.*, 241 F.3d 439, 443 (5th Cir. 2001); *Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773, 776 (7th Cir. 2000)). In so holding, the courts relied heavily on uniformity, explaining the "uniformity

demanded by the FRSA 'can be achieved only if [federal rail safety regulations] are applied similarly to a FELA plaintiff's negligence claim and a non-railroad employee plaintiff's state law negligence claim.'" *Nickels*, 560 F.3d at 430 (quoting *Lane*, 241 F.3d at 443) (alteration in original). District courts within the circuit (and elsewhere) have applied this rationale to the LIA. *See Munns v. CSX Transp., Inc.*, 2009 WL 805133, at *5 (N.D. Ohio) (holding "the LIA preempts plaintiff's FELA claim as to design defects, including his contentions about ergonomic unsuitability, regarding the seats on which he rode"); *Evans v. Union Pac. R.R. Co.*, 2015 WL 1945104 (D. Co.) (LIA precludes FELA claim alleging defective design); *Parise v. Union Pacific R.R.*, 2014 WL 2002281, at *7 (E.D. Ca.) (LIA precludes FELA claim when it would preclude state law claim).[6]

In 2014, the Supreme Court addressed the issue of federal preclusion in *POM Wonderful LLC v. Coca-Cola Company*, 134 S. Ct. 2228 (2014). The parties dispute what, if any, effect this has on the preclusion of FELA claims by the LIA. In *POM Wonderful*, the court addressed whether the Food, Drug, and Cosmetic Act (FDCA) precluded a private party from bringing a claim under

---

6. This is not to say that courts are uniform in so holding and Plaintiff cites cases to the contrary (Doc. 30, at 16-17). *See, e.g.*, *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088, 1091 (4th Cir. 1987) (holding Plaintiff had no BIA claim but might have FELA claim on the same facts); *Weaver v. Mo. Pac.*, 152 F.3d 427 (5th Cir. 1998) (same); *Palmer v. Union Pac.*, 12 F. Supp. 2d 588 (S.D. Tex. 1998) (rejecting preclusion argument and stating: "[f]ederal railroad safety laws such as FELA and LIA are in pari material and must be liberally construed to carry out their remedial and humanitarian purposes."). *See also generally* Am. Law Reports, *Preemptive Effect of Locomotive Inspection Act (LIA)*, 78 A.L.R. Fed. 2d 389, at §§4-5 (2017) (collecting cases holding FELA claims are or are not precluded by the LIA).

This is also not to say that *every* FELA claim related to a locomotive is precluded by the LIA. Even those cases finding preclusion on some grounds have distinguished between the types of claims that are precluded and those that are not. *See, e.g.*, *Munns*, 2009 WL 805133, at *5 (finding seat design claim under FELA precluded by FRSA and LIA, but allowing FELA claim to proceed "based on his having to ride on broken seats, or seats otherwise in disrepair"); *Evans*, 2015 WL 1945104, at *4 (finding FELA defective design claim precluded by the LIA, but permitting negligent maintenance claim to proceed).

the Lanham Act challenging as misleading a food label regulated by the FDCA. There, the Petitioner, POM Wonderful ("POM"), brought suit against Coca-Cola Company ("Coca-Cola"), alleging the name, label, marketing, and advertising of Coca-Cola's pomegranate blueberry juice blends misled consumers into believing the product consisted of those two juices, when it in fact consisted primarily of apple and grape juices. *Id.* at 2233. POM sued under a provision of the Lanham Act, 15 U.S.C. § 1125, which permits a competitor to sue another if it alleges unfair competition from false or misleading product descriptions. *Id.* The Ninth Circuit granted summary judgment to Coca-Cola, finding the Lanham Act claim was precluded by the FDCA, in that the FDCA had comprehensively regulated juice labeling and had not imposed restrictions such as those asserted by POM. *Id.*

In reversing, the Supreme Court analyzed the text of the statutes, as well as their respective purposes and enforcement mechanisms. *Id.* at 2237-40. The Court first noted neither statute, "in express terms, forbids or limits Lanham Act claims by challenging labels that are regulated by the FDCA." *Id.* at 2237. The Court found the absence of such terms significant, given how long the two federal statutes had coexisted. *Id.* ("If Congress had concluded, in light of experience, that Lanham Act suits could interfere with the FDCA, it might well have enacted a provision addressing the issue during these 70 years."). Significantly, the FDCA has been revised, and an express pre-emption provision was added preempting state laws on food and beverage misbranding. *Id.* ("Pre-emption of some state requirements does not suggest an intent to preclude federal claims.").

Next, the Court addressed the purposes behind the two statutes and noted each was designed with a different purpose, and those purposes were complementary to one another. "Although both statutes touch on food and beverage labeling, the Lanham Act protects commercial

interests against unfair competition, while the FDCA protects public health and safety." *Id.* at 2238.

Additionally, the Court noted, the two statutes complement one another in their respective enforcement mechanisms. *Id.* at 2238-39. Enforcement of the FDCA is primarily left to the FDA, which "does not have the same perspective or expertise in assessing market dynamics that day-to-day competitors possess." *Id.* at 2238. "Allowing Lanham Act suits takes advantage of synergies among multiple methods of regulation. This is quite consistent with the congressional design to enact two different statutes, each with its own mechanisms to enhance the protection of competitors and consumers. *Id.* at 2239.

Additionally, the Court rejected Coca-Cola's argument that the FDCA must preclude a Lanham Act claim because Congress intended national uniformity in food and beverage labeling. *Id.* at 2239-40. The Court rejected the argument that the delegation of enforcement authority of FDCA requirements to the Federal Government showed an intent to achieve national uniformity, stating: "But POM seeks to enforce the Lanham Act, not the FDCA or its regulations. The centralization of FDCA enforcement authority in the Federal Government does not indicate that Congress intended to foreclose *private enforcement of other federal statutes.*" *Id.* at 2239 (emphasis added). The Court again focused on the text of the statute, which, by its terms, preempts only certain state law requirements and not federal law, and explained:

> Although the application of a federal statute such as the Lanham Act by judges and juries in courts throughout the country may give rise to some variation in outcome, this is the means Congress chose to enforce a national policy to ensure fair competition. It is quite different from the disuniformity that would arise from the multitude of state laws, state regulations, state administrative agency rulings, and state-court decisions that are partially forbidden by the FDCA's preemption provision. Congress not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas where national uniformity is important.

*Id.* at 2239-40.

Finally, the Court rejected Coca-Cola's argument that the FDCA preempted the Lanham

Act claim because the FDCA addresses food and beverage labeling with more specificity than the

Lanham Act:

> Because, as we have explained, the FDCA and the Lanham Act are complementary and have separate scopes and purposes, this greater specificity would matter only if the Lanham Act and the FDCA cannot be implemented in full at the same time. See *RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. ——, ——, 132 S.Ct. 2065, 2070–2072, 182 L.Ed.2d 967 (2012). But neither the statutory structure nor the empirical evidence of which the Court is aware indicates there will be any difficulty in fully enforcing each statute according to its terms.

*Id.* at 2240.

Analogizing to and applying the reasoning of the *POM Wonderful* decision, several courts

have subsequently held—contrary to the earlier decisions in *Nickels*, *Lane*, and *Waymire*—that the

FRSA[7] does not preclude a claim under the FELA. *See, e.g., Henderson v. Nat'l R.R. Passenger*

---

7. A brief discussion of the FRSA is necessary to this analysis. The FRSA's purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347 (2000) (quoting 49 U.S.C. § 20101). The FRSA provides that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a). To accomplish such uniformity, the FRSA contains an express preemption clause pursuant to which "[a] State may adopt or continue in force a law, regulation or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* § 20106(a)(2). The FRSA also preempts state tort law claims. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 670-71 (1993). An FRSA regulation covers and thus preempts a state tort law claim if it "substantially subsume[s] the subject matter of that claim." *Id.* at 664. As noted above, courts have previously relied on the FRSA's uniformity purpose to also hold FELA claims preempted:

> Dissimilar treatment of the claims would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless: "The railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA with respect to other classes of plaintiffs for the very same conduct".

*Lane*, 241 F.3d at 443 (quoting *Waymire v. Norfolk & W. Ry. Co.*, 65 F. Supp. 2d 951 (S.D. Ind. 1999), *aff'd* 218 F. 3d 773 (7th Cir. 2000).

*Corp.*, 87 F. Supp. 3d 610, 620-21 (S.D.N.Y. 2015); *Madden v. Antonov & AV Transp., Inc.*, 156

F. Supp. 3d 1011, 1020-22 (D. Neb. 2015); *Oliveros v. BNSF Ry. Co.*, 2016 WL 7475663, at *2

(D. Neb.); *Hananburgh v. Metro-North Commuter R.R.*, 2015 WL 1267145, at *3-4 (S.D.N.Y.);

*Shiple v. CSX Transp., Inc.*, -- N.E.3d --, 2017 WL 462595 (Ohio App. 2017); *Cottles v. Norfolk*

*S. Ry.*, -- So. 3d --, 2016 WL 4493661 (Ala. 2016); *Fair v. BNSF Ry. Co.*, 238 Cal. App. 4th 269,

289 (2015); *Noice v. BNSF Ry. Co.*, 348 P. 3d 1043, 1049 (N.M. Ct. App. 2015). In so doing, these

courts have either held that the previous preclusion analysis advanced by *Nickels*, *Lane*, and

*Waymire* is incorrect, or *POM Wonderful* alters that analysis. This is so, they reason, because

(applying the factors applied in *POM Wonderful*), "[n]either the plain text of FRSA nor its goal of

national uniformity demand preclusion of FELA claims. Rather the text of FRSA and the purposes

underlying both it and FELA demand the opposite." *Madden*, 156 F. Supp. 3d at 1019. As in *POM*

*Wonderful*, lower courts have looked to the statutory text of the FRSA in examining the preclusion

issue. As one district court explained:

> Although . . . *POM Wonderful* . . . involved two different statutes, the Court finds
> its reasoning highly instructive in interpreting the relationship between the FELA
> and the FRSA. Like the FDCA, the FRSA authorizes an agency to promulgate
> specific regulations in furtherance of the statute's purpose and provides that those
> regulations preempt certain state laws in the interest of national uniformity. Like
> the Lanham Act, the FELA provides a broad private right of action under federal
> law that purportedly undermines such uniformity. And like the relationship
> between the Lanham Act and the FDCA, the FELA and the FRSA complement
> each other in significant respects, in that each statute is designed to accomplish the
> same goal of enhancing railroad safety through different means. Under these
> circumstances, *POM Wonderful* clearly dictates that the FRSA should not be
> interpreted to preclude federal claims under the FELA, in accordance with the plain
> meaning of its text. Admittedly, whereas the objective of achieving nationally
> uniform laws in a particular area is explicitly stated in the FRSA's state law
> preemption provisions, that objective is merely implicit in the similar provisions of
> the FDCA. But it is clear from the reasoning in *POM Wonderful* that this relatively
> minor distinction does not warrant reaching a different result. Nothing in the
> Supreme Court's decision suggests that its reasoning hinged on Congress's failure

to make explicit the FDCA's implicit objective of achieving nationally uniform laws related to food and drink labeling.

*Henderson*, 87 F. Supp. 3d at 620–21. The court in *Henderson* further cited the Supreme Court's "instructions that the FELA's broad scope should not be limited by inference" in determining the FRSA and its regulations do not preclude FELA claims. *Id.* at 621 (citing *Urie*, 337 U.S. at 186). Another district court compared the outcomes with and without preclusion:

> The Court finds it illustrative to compare (1) the effect on FRSA of allowing FELA claims to continue with (2) the effect on FELA of giving FRSA a preclusive effect. Allowing FELA claims to continue is a mixed bag from the perspective of FRSA— it will further safety but at some expense to uniformity. On the other hand, the purpose of FELA is solely to promote the safety of railroad workers, and allowing FRSA to preclude FELA claims would work unmitigated harm on that purpose, by leaving injured workers with no recourse against their employer and insulating broad categories of potentially negligent conduct from any accountability.

*Madden*, 156 F. Supp. 3d at 1021.

One state trial court has, however, come to the opposite conclusion. *See Schendel v. Duluth*, 2014 WL 5365131 (Minn. Dist. Ct.). There the court found *POM Wonderful*'s conclusion could not be extended to FRSA/FELA preclusion based on three primary distinctions. *Id.* at *3-4. First, while the FDCA and Lanham Act had different purposes, "[i]n contrast, the purpose of both FRSA and FELA is railroad safety, albeit from slightly different perspectives". *Id.* at *3. Second, unlike in *POM Wonderful* where a competitor would have different market expertise than the FDA, "[i]n a FELA case, there is no similar analogy" because "[t]he FRSA sets forth safety rules that protect both employees and the public, and the employee's right to sue for negligence does not bring any different expertise or enforcement options." *Id.* at *4. Third, the court noted that "unlike the Lanham Act and the FDCA, FELA and FRSA are not 'complementary' in achieving separate enforcement goals through different mechanisms; rather, the statutes potentially work at cross-purposes on a common set of facts." *Id.* The court explained: "a railroad's strict adherence to FRSA regulations cannot logically provide a complete defense to negligence alleged by a member of the

public, yet somehow rendered meaningless in a suit from within by one of the railroad's own employees." *Id.* That is, it makes no sense for FRSA regulations to completely preempt a state law negligence claim, but to allow a FELA negligence claim on the same facts to go forward. *Id.* The court acknowledged that "like the statutes in *POM Wonderful*, FELA and FRSA have co-existed for a significant period of time with only state preemption provisions, and without any express preclusion of one another", but found the other factors counseled in favor of preclusion. *Id.*

With this background, the undersigned turns to the instant issue: whether the LIA precludes a claim under the FELA that Defendant was negligent for failure to install a special shelf or holding area for water bottles. In so doing, the Court is left with two questions: (1) whether preclusion of FELA claims by the LIA is any different than preclusion of FELA claims by the FRSA; and (2) whether *POM Wonderful* clearly alters the Sixth Circuit's reasoning in *Nickels*.[8]

The present case deals with the issue of preclusion of FELA claims by the LIA, rather than the FRSA. As noted above, the Supreme Court has held the LIA occupies the entire field of regulating locomotive equipment. *Kurns*, 132 S. Ct. at 1267. And the Court has emphasized LIA field preemption applies regardless of any difference in purpose between the state and federal law: "Because the States' requirements operated upon the same physical elements as the LIA, the Court

---

8. In *POM Wonderful*, the Supreme Court noted, without deciding, that there are two competing standards for the framework of preclusion law. 134 S. Ct. at 2236-37. First, under *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009), there is an argument to be made as to whether one statute is an "implied repeal" of another statute. *Id.* In this case, courts are instructed to give full effect to both statutes unless they are in "irreconcilable conflict." *Id.* at 2237. Alternatively, the court noted the principle that a more specific statute may clarify or narrow the scope of a more general law, citing *United States v. Fausto*, 484 U.S. 439, 453 (1988). *Id.* In that case, the court's task is to "reconcil[e]" the two laws. *Id.* The *POM Wonderful* decision did not resolve this tension because "Even assuming that Coca-Cola is correct that the Court's task is to reconcile or harmonize the statutes and not, as POM argues, to enforce both statutes in full unless there is a genuinely irreconcilable conflict, Coca-Cola is incorrect that the best way to harmonize the statute is to bar POM's Lanham Act claim." *Id.*

held the state laws, however commendable or however different in their purpose, fell within the LIA's pre-empted field." *Id.* at 1266 (citing *Napier*). The district court's opinion in *Parise* is instructive here in comparing the LIA to the FRSA. 2014 WL 2002281, at *3-8. There, the Plaintiff claimed negligence based on a failure to install seatbelts on locomotives or warnings regarding the hazards of riding "rough riding" locomotives. *Id.* Plaintiff did not allege that the LIA, FRSA, or implementing regulations required either of these things explicitly, but relied on "general principles of negligence, contending that [defendant] failed to use reasonable care in furnishing plaintiff with a safe place to work by neglecting to provide the seat belts and warnings." *Id.* at *5. "Obviously if plaintiff had brought similar negligence-type claims under state law, it would have been a simple matter to conclude that they are preempted by the LIA." *Id.* (citing *Kurns*, 132 S. Ct. at 1267-68 and *Law v. General Motors Corp.*, 114 F.3d 908-910-11 (9th Cir. 1997)). The court acknowledged opinions holding certain FRSA regulations do not preclude FELA claims, but "ultimately [found] those claims to be inapposite here, because LIA preemption of state law claims (and therefore by extension, LIA preclusion of FELA claims) is *much broader* than FRSA preemption/preclusion." *Id.* at *7 (emphasis added).

Because the LIA is broader, and because—as discussed further below—*Nickels* remains good law in this circuit, the undersigned finds Plaintiff's FELA claim for failure to install a shelf or other equipment to hold water bottles is precluded by the LIA. *See Munns*, 2009 WL 805133, at *5 (LIA precludes FELA claim). Applying the reasoning of *POM Wonderful* does not so clearly change this analysis to compel the opposite conclusion. Whereas in *POM Wonderful* (and also with the FRSA), there was an express preemption of state statutes, the LIA has no such preemption provision. The *POM Wonderful* court relied on this express preemption of state laws and the

principle of *expressio unis est esclusio alterius* to hold one federal law was not precluded by the other. 134 S. Ct. at 2238. No such express preemption is at issue here. Second, the statutes addressed by *POM Wonderful* served different, but complementary purposes. Here, the FELA and LIA serve the same purpose: railroad safety. *See Gottshall*, 512 U.S. at 543 (FELA construed to "further Congress's remedial goal of holding railroads responsible for the physical dangers to which their employees are exposed"); *Lilly*, 317 U.S. at 486 (prime purpose of LIA is "the protection of employees and others by requiring the use of safe equipment); *Urie*, 337 U.S. at 189-90 (LIA and FELA have "basically the same" congressional purpose). Third, there is also no different enforcement mechanism as existed in *POM Wonderful*. Here, both the FELA and the LIA rely on general negligence principles and private civil actions to achieve their goals.

Logic also dictates this conclusion. As the Ninth Circuit explained in *Law*, "The virtue of uniform national regulation is self-evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state." 114 F.3d at 910 (internal quotation and citation omitted). The undersigned finds Defendant's argument in this regard persuasive:

> For example, one jury, hearing a claim such as [Plaintiff's] could determine the railroad was negligent for failing to install a special shelf for water bottles, while another jury, hearing a claim that an employee injured himself by bumping into the shelf, might conclude that the very same railroad was negligent for having installed the shelf. The railroad would be in an impossible quandary, and Congress's goal of national uniformity in railroad safety regulation would be defeated by piecemeal litigation.

(Doc. 31, at 5).

Moreover, *Nickels*—holding that national uniformity in railroad safety regulation can be achieved only by federal regulations precluding FELA negligence claims to the same extent it

22

preempts state law negligence claims—remains good law in the Sixth Circuit and therefore binds this Court. This Court certainly has an obligation to follow the Supreme Court where an intervening decision of that Court directly reverses an opinion of the Sixth Circuit or implicitly reverses same through a case with indistinguishable facts. *In re Higgins*, 159 B.R. 212, 215–16 (S.D. Ohio 1993). If, however, the intervening decision neither expressly nor implicitly overrules the prior Sixth Circuit decision, this Court must "be extremely careful in concluding that circuit precedent is no longer good law," *Id.* at 216 (quoting *Rodriguez v. Bowen*, 678 F. Supp. 1456, 1462 (E.D. Cal. 1988)), and should only deviate from such authority where it is "powerfully convinced that the circuit will overrule itself at the next available opportunity." *Id.* Stated another way, "*sub silentio* overruling of a Court of Appeals decision by a Supreme Court case resting on different facts is a rare occurrence," and thus requires strong, objective evidence that the "higher court would repudiate [its holding] if given a chance to do so." *Id.* (quoting *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir. 1986)). For the reasons stated above, the undersigned is not "powerfully convinced" that the Sixth Circuit would overrule *Nickels* based on *POM Wonderful* due to the distinctions discussed.[9]

The undersigned acknowledges that other factors counsel against preclusion here and does not lightly reach the conclusion that one federal statute precludes another. To be clear, this is a close call and reasonable jurists could disagree. Like the statutes in *POM Wonderful*, neither the FELA nor the LIA expressly forbids or limits FELA claims, despite a lengthy coexistence. Arguably, therefore, like in *POM Wonderful*, "[i]f Congress had concluded, in light of experience,

---

9. Again, this is especially true given that the LIA is broader than the statute addressed by *Nickels*, the FRSA.

that [FELA] suits could interfere with the [LIA], it might well have enacted a provision addressing the issue[.]" 134 S. Ct. at 2237. Moreover, the *POM Wonderful* court rejected a similar uniformity argument, explaining that the harm to uniformity resulting from:

> the application of a federal statute such as the Lanham Act by judges and juries in courts throughout the country may give rise to some variation in outcome, this is the means Congress chose to enforce a national policy to ensure fair competition. It is quite different from the disuniformity that would arise from the multitude of state laws, state regulations, state administrative agency rulings, and state-court decisions that are partially forbidden by the FDCA's pre-emption provision.

*Id.* at 2239-40. However, on balance, and given that *Nickels* remains binding law in the Sixth Circuit[10], the undersigned concludes that *POM Wonderful* did not alter this analysis, *particularly* as it relates to the broad scope of the LIA and locomotive regulations. Therefore, Plaintiff will not be permitted to argue Defendant was negligent in failing to install additional equipment not mandated by the LIA (a shelf or storage locker), and Plaintiff's FELA claim based on the absence of such additional equipment is precluded by the LIA. As discussed below, Plaintiff may, however, proceed on his general negligence claim under the FELA regarding placement of the box.

**Foreseeability**

Defendant's final argument in favor of summary judgment is that Plaintiff has presented no evidence of foreseeability of this harm. (Doc. 26, at 6-7). Plaintiff contends his testimony (and the Declaration of his expert, Paul Byrnes) provides sufficient evidence to overcome summary judgment on this ground. (Doc. 30, at 8-10). For the reasons discussed below, the undersigned

---

10. Notably, none of the post-*POM Wonderful* district court cases addressing FRSA/FELA preclusion have come from courts within (and therefore bound by) the Fifth, Sixth, or Seventh Circuits. Thus, none have had to grapple directly with whether *POM Wonderful* directly overrules *Waymire*, *Lane*, or *Nickels*, but have rather reasoned without such precedential constraint.

agrees that Plaintiff has presented a triable issue of fact on his FELA claim for placement of the box.[11]

An essential element of a plaintiff's FELA claim is that the injury he sustained was reasonably foreseeable to the defendant. *Gallick v. Baltimore & Ohio R.R. Co.,* 372 U.S. 108,117 (1963); *Green v. River Terminal Ry. Co.,* 763 F.2d 805, 808 (6th Cir. 1985). To overcome a motion for summary judgment based on foreseeability of harm, Plaintiff must present evidence sufficient to give rise to a reasonable inference that Defendant knew or should have known that it was not acting adequately to protect its employees. *Frazier v. CSX Transp.,* 156 F.3d 1229 (table), 1998 WL 449684, at *2 (6th Cir.); *Williams v. Grand Trunk W. R.R., Inc.,* 352 F. App'x 13, 17 (6th Cir. 2009) ("A defendant, however, cannot be held negligent 'absent proof that such defect was known, or should or could have been known, by defendant, with opportunity to correct'") (citation omitted); *Barger v. CSX Transp., Inc.,* 110 F. Supp. 2d 648, 653 (S.D. Ohio 2000) ("In order to prevail on a claim of defective equipment, a plaintiff must demonstrate that the defendant had actual or constructive notice of the defect prior to the accident or the plaintiff must show that such an injury was reasonably foreseeable to the defendant."). Plaintiff need not show Defendant could have foreseen the precise nature or extent of injury that occurred, only that Defendant knew or should have known some injury could occur as a result of the defective or dangerous condition.

---

11. Because the undersigned has found Plaintiff has presented no evidence of a claim under the LIA, and that the LIA precludes any claim for failure to install additional equipment on the locomotive, the only claim remaining at this stage is that Defendant was somehow negligent in its placement of the box. *See* Doc. 30-1, at 16 ("That box of water was improperly stored"); Doc. 1, at 1 (alleging violation for "storing cases of water bottles in a location on said engine which was difficult to access" and permitting boxes of water to be stored on the locomotive in a manner which was not reasonably safe); Doc. 30, at 9 (responding to summary judgment and pointing to the "lack of locker or designated space").

*Gallick,* 372 U.S. at 120 (finding an insect bite resulting from an infested pond near plaintiff's worksite to be reasonably foreseeable even if the resulting infection was not).

Here, Plaintiff has presented evidence—in the form of his testimony, and the Declaration of Paul Byrnes[12]—to create a question of fact as to whether some harm from placement of the water was reasonably foreseeable to Defendant. He has presented testimony to show: 1) the water was placed in the locomotive cab before Plaintiff boarded (Doc. 30-1, at 11); 2) the water was "wedged" in (*Id.* at 17)[13]; and 3) it was "common courtesy" to replenish the refrigerator in the cab of the locomotive with bottled water (Doc. 30-3, at 5). This is sufficient to show the water bottles would be accessed, and an injury from moving the water bottles was reasonably foreseeable to Defendant, particularly given the relaxed standard of proof of causation in FELA cases. *See Green*, 763 F.2d at 808 ("The test of foreseeability does not require that the negligent person should have been able to foresee the injury in the precise form in which it in fact occurred. Rather, it is sufficient if the negligent person might reasonably have foreseen that *an* injury might occur . . . .") (quoting *Miller v. Cincinnati, New Orleans & Tex. Pac. Ry. Co.*, 203 F. Supp. 107 113 (E.D. Tenn. 1962)) (emphasis in original); *Szekeres*, 617 F.3d at 428 (a plaintiff's testimony alone is sufficient to survive summary judgment).

---

12. Based on the analysis above, Byrnes will also not be permitted to offer his opinion that Defendant was negligent for failure to install additional equipment on the locomotive.

13. Part of Defendant's argument is based on the conclusion that Plaintiff is arguing the box of water was wedged "under" the seat. Defendant argues that this is contrary to the condition depicted where the seat appears to be significantly taller than the box. Plaintiff's testimony, however, was that the box was wedged "in". *See* Doc. 30-1, at 17 ("It was on an angle. That's all I can tell you. It was on an angle wedged in there."). Plaintiff's argument (and testimony) is that the box was wedged somehow, not necessarily that it was wedged *under* the seat bottom. For purposes of summary judgment, the undersigned must view the facts in the light most favorable to the non-moving party, here, Plaintiff. Whether the box was "wedged" as Plaintiff claims is a disputed fact, and his testimony is sufficient to survive summary judgment on this claim. *See Szekeres*, 617 F.3d at 428

**CONCLUSION**

In conclusion, Defendant's motion for summary judgment should is granted in part, and denied in part. Plaintiff is precluded from making the argument that Defendant was negligent in failing to install a shelf or storage locker (or anything else) on the locomotive to hold water bottles under the LIA, or under the FELA due to preclusion. Plaintiff, however, can proceed on his general negligence claim under the FELA that Defendant was negligent in its placement of the box behind the seat.

    s/James R. Knepp II
    United States Magistrate Judge